SCOTT LAKE
NV Bar No. 15765
**CENTER FOR BIOLOGICAL DIVERSITY**
P.O. Box 6205
Reno, NV 89513
Phone: (802) 299-7495
Email: slake@biologicaldiversity.org

*Attorney for Plaintiff Center for Biological Diversity*

GORDON H. DEPAOLI
NV Bar. No. 0195
**WOODBURN AND WEDGE**
6100 Neil Road, Suite 500
Reno, NV 89511
Phone: (775) 688-3010
Email: gdepaoli@woodburnandwedge.com

*Local Counsel for Plaintiff Fallon Paiute-Shoshone Tribe*

WYATT GOLDING
WA Bar No. 44412 (will comply with LR IA 11-2 within 1 day)
**ZIONTZ CHESTNUT**
1230 Fourth Ave, Suite 1230
Seattle, WA 98070
Phone: (206) 480-1230
Email: wgolding@ziontzchestnut.com

*Attorney for Plaintiff Fallon Paiute-Shoshone Tribe*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| FALLON PAIUTE-SHOSHONE TRIBE and the CENTER FOR BIOLOGICAL DIVERSITY; | Case No.: 3:21-cv-00512-RCJ-WGC |
| Plaintiffs, | |
| vs. | **PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION** |
| U.S. DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT, and JAKE VIALPANDO in his official capacity as Field Manager of the Bureau of Land Management Stillwater Field Office; | |
| Defendants. | |

1

**INTRODUCTION**

Pursuant to Federal Rules of Civil Procedure 65(a) and (b), Plaintiffs move for a temporary restraining order or, in the alternative, a preliminary injunction to halt imminent destruction of imperiled species, their habitat, and an area of incalculable spiritual and cultural value to the Fallon Paiute-Shoshone Tribe (the "Tribe"). Defendants' unlawful approval of the Dixie Valley Geothermal Utilization Project ("Project") threatens imminent and irreparable harm to the spiritual, cultural, religious, aesthetic, and recreational benefits that Plaintiffs derive from federal lands and wildlife in their current, undisturbed state. Defendants' unlawful decision also threatens irreparable harm to Plaintiffs' statutory rights and interests in fully-informed federal land management.

An injunction is necessary to halt a rush by Proposed Defendant-Intervenor Ormat Nevada, Inc. ("Ormat") to construct the Project before the Court can determine the legality of Defendants' actions. Defendants approved the Project on November 23, 2021, and Plaintiffs have been informed by Ormat's counsel that beginning on the morning of January 6, 2021, the company will start scraping a 10-acre building pad and access road, digging a diversion ditch, and will promptly thereafter construct the first of two powerplants within the sacred landscape and imperiled wildlife habitat.

Defendants failed to follow laws designed to ensure consideration of Tribal cultural and spiritual values, environmental effects, and substantive law. The premature and uninformed manner in which Defendants approved the Project threatens permanent harm by scarring the unique, sensitive, and sacred environment at Dixie Meadows and locking in government decisionmaking in ways that cannot be undone. Allowing construction to go forward would irreparably harm Plaintiffs and their interests in performing traditional Northern Paiute and Western Shoshone religious practices, viewing wildlife, recreating, taking photographs, seeking solitude, and communing with the natural world. By contrast, a temporary stay of Defendant's unlawful actions pending adjudication of the merits would not harm Defendants, and Ormat would experience only minimal delay.

2

**FACTUAL BACKGROUND**

Dixie Meadows is located at the base of the Stillwater mountain range approximately 40 miles east of Fallon, Nevada. The thermal springs and wetlands at Dixie Meadows hold a central place in the religious beliefs and spiritual practices of the Tribe and create the only known habitat for the imperiled Dixie Valley toad (*Anaxyrus williamsi*). The Project would irreparably alter the environment in and around Dixie Meadows, destroy the area's spiritual and religious value for the Tribe, and threaten the Dixie Valley toad with extinction. Construction impacts including bulldozing, road construction, and pouring the concrete foundation for a massive power plant, are imminent and threaten to permanently destroy the site's pristine and sacred character unless this Court grants preliminary relief.

## I.    Dixie Meadows and Dixie Hot Springs (*Paumu*)

Dixie Meadows is sacred to the Tribe and its members, who know the area as *Paumu* in their native language and have utilized the Dixie Meadows hot springs for traditional cultural and religious practices for thousands of years. Ex. B (Downs Decl.) ¶¶ 7, 20-31; Ex. H (Tribe's comments on Revised Draft EA) at 2-3. The sacred *Paumu* site consists of the springs as well as the surrounding landscape. Ex. B (Downs Dec.) ¶ 15.

According to a seminal ethnographic text concerning the Fallon Paiute-Shoshone Tribe published by the U.S. government:

> Hot springs occurring in various areas of [the Tribe's] territory were all considered to be sacred places. Due to White settlement and development, however, most were rendered inaccessible to Indian people by the early 1900s. The exception was the large hot springs in Dixie Valley (*paumagwaitu*), toward the north end. . . . [M]any . . . people from the Stillwater area visit[] this spring on a regular basis, taking baths in the hot mud and water.

Ex. H (Tribe's comments on Revised Draft EA), at 3.

The Tribe's spiritual beliefs are centered in the understanding of the Earth as a living being that holds spiritual significance in its undisturbed state. Ex. B (Downs Decl.) ¶¶ 12-14. Because the Tribe considers *Paumu* sacred, the degradation of the hot springs and surrounding landscape from Ormat's impending construction activities will substantially burden Tribal members' cultural and spiritual practices, as well as their traditional religious expression. *Id.* ¶¶ 29, 33-42. The

spiritual significance of the site for Tribal members would be permanently and irreparably damaged if it were to be disturbed, altered, or destroyed. *Id.* ¶¶ 25-26.

Dixie Meadows also provides habitat for a wide variety of wildlife species, including birds, amphibians, and springsnails. Ex. Y (Final EA) at 3-68 to 3-88. Some of these species are highly imperiled and at least one of them, the Dixie Valley toad, is found nowhere else on Earth. *See id.* (listing special status species that may be present at Dixie Meadows); *see also* Ex. M (petition to list the Dixie Valley toad as threatened or endangered) at 8.

## II. The Dixie Valley Toad

The Dixie Valley toad is a small species of Western toad found only within and around the Dixie Meadows wetland complex. Ex. Y (Final EA) at 3-77 to 3-79. The toad spends the vast majority of its life cycle very close to the thermal waters of Dixie Meadows. *Id.* Toads also use upland terrestrial habitats directly adjacent to the wetlands. *Id.* at 3-91. Surface disturbance and grading during the early phases of Project construction could crush or bury toads using upland burrows or moving through terrestrial habitat. *Id.*

Dixie Valley toads are especially sensitive to changes in water temperature. Ex. M (petition to list the Dixie Valley toad) at 16-17; *see also* Ex. O (FWS 90-day petition review) at 4. The toad relies on a stable thermal regime to survive through the winter. *See* Ex. M (petition) at 5. Decreases in water temperature at the springs will reduce the area of thermal refuge available to the toad, or possibly eliminate it altogether, risking the potential extinction of the species. *Id.* at 16-17.

The Dixie Valley toad is threatened by a variety of factors, *see id.* at 9-26, but the most immediate threat to the toad's survival is the Project, which, beginning on January 6, will destroy or degrade much of the toad's terrestrial habitat and over the long term is likely to reduce, alter, or eliminate the flow of warm water to the springs. *Id.* at 9-21; *see also* Ex. O (FWS 90-day review), at 2-5; Ex. Y (Final EA) at 3-91; Ex. A (Lake Decl.) ¶ 7-8.

Because of the threat posed by the Project, the Center for Biological Diversity (the "Center") on September 18, 2017 petitioned the U.S. Fish and Wildlife Service ("FWS") to list the species as threatened or endangered under the Endangered Species Act ("ESA"). *See generally*

4

Ex. M (petition). On June 26, 2018, FWS found that the Center's petition presented "substantial scientific or commercial information indicating" that listing the Dixie Valley under the ESA "may be warranted." Ex. N (FWS 90-day finding) at 30093. FWS acknowledged that "[t]he toad's life cycle is entirely reliant on dependable flows from the springs at Dixie Meadows, and a . . . if geothermal energy production occurs at Dixie Meadows," the toad's habitat "could be reduced or eliminated." Ex. O (petition review), at 3. FWS also noted "the difficulty of detecting negative impacts" and "mitigat[ing] for these impacts." *Id.* at 4-5.

**III.    The Project**

The Dixie Meadows Geothermal Utilization Project will involve the construction of two 30-megawatt geothermal powerplants and associated infrastructure, including 18 or more well pads (each 1.5 acres in size) pipelines, access roads, offices, electrical facilities, a control room, various auxiliary buildings, a microwave communication tower, two electrical substations, and transmission lines, all directly adjacent to the Dixie Meadows wetlands. The project would convert 126 acres of otherwise pristine high desert to major industrial facilities—the size of 95 football fields—and build 48 miles of transmission lines. Ex. Y (Final EA) at 2-1 to 2-25.

In the coming days and weeks, Ormat will commence with vegetation removal, bulldozing, grading, and road construction. Ex. A (Lake Decl.) ¶ 7-8. Over the next year, the company will build at least one 35-foot tall power plant and operate 170-foot-tall drilling masts 24 hours a day, 7 days a week, for extended periods of time. Ex. Y (Final EA) at 2-10 to 2-11. Construction will create noise and light pollution as well as fugitive dust emissions. *See id.* at 2-1 to 2-25; Ex. B (Downs Decl.) ¶¶ 33-42.

Once operational, the facility would extract and reinject approximately 12.8 million pounds of geothermal water per hour (28,000 gallons per minute/45,000 acre-feet per year) from the same underground geothermal reservoir that feeds the hot springs. Ex. Y (Final EA) at 2-17. Because of this imbalance between the springs' natural flow of 900 acre-feet per year and the rate of geothermal utilization, the Project could overwhelm the natural system and significantly degrade wetlands at Dixie Meadows. Ex. Q (Myers Tech. Memo) at 4, 9.  Operation of the most closely

analogous project, constructed by Ormat in nearby Jersey Valley, likely caused the associated hot springs to run dry. Ex. E (Tribe comments) at 6; Ex. L (Center comments) at 4-6.

**IV.     BLM's NEPA Process and Mitigation Plan**

On May 9, 2017, BLM released a Draft environmental assessment ("EA") and offered the first of two public comment periods for the Project. Ex. D (Donnelly Decl.) ¶ 20. The Draft EA revealed that BLM had failed to collect or analyze a great deal of information necessary to understanding the Project's environmental impacts. *Id.* ¶ 22. Throughout the Draft EA, BLM asserted that potentially significant impacts to nearly every resource analyzed—including water, wetlands, wildlife, and Tribal cultural and spiritual values—would be mitigated through implementation of an "Aquatic Resources Monitoring and Mitigation Plan" ("ARMMP"). *Id.* However, BLM did not provide the ARMMP for public review. *Id.* In fact, BLM had not even developed the ARMMP when the agency released the Draft EA which relied on the plan. Id.

Plaintiffs submitted detailed comments responding to the Draft EA, explaining that many of the Project's likely impacts to springs, wetlands, wildlife, and Tribal sacred sites could not be effectively mitigated. *See generally* Ex. E (Tribe comments); Ex. L (Center comments). The Tribe also detailed the cultural, religious, and spiritual significance of the springs. *See* Ex. E (Tribe comments) at 2. The Tribe explained that, even without the extraction of geothermal fluid, the proposed alteration of the natural environment around the springs would preclude Tribal members from partaking in their traditional practices. *Id.* at 5. Construction of major powerplants, with associated noise, disturbance, light, and obstruction of views, would substantially detract from the Tribe's ability to exercise its cultural, religious, and spiritual traditions. *Id.* at 6-7. Plaintiffs' comment letters further informed BLM that several other geothermal energy facilities, including a similar facility in Jersey Valley, Nevada have caused catastrophic impacts to nearby springs. *Id.* at 6; Ex. L (Center comments) at 4-6.

Defendants failed to meaningfully respond to these comments. Over three years later, on January 13, 2021, BLM issued a Revised Draft EA ("RDEA") for the Project. Ex. D (Donnelly Decl.) ¶ 34. BLM included with the RDEA a draft version of the ARMMP but once again omitted

key information about the affected environment and the proposed mitigation measures. *See generally* Ex. P (Center comments); Ex. H (Tribe comments); Ex. R (FWS comments); Ex. S (NDOW comments); Ex. T (Navy comments). As FWS commented, the ARMMP was not a fully developed mitigation protocol but rather a "plan describing the development of a plan." Ex. R (FWS comments) at 11.

The RDEA and draft ARMMP admitted that neither BLM nor Ormat had collected important baseline data about the wetlands and geothermal hydrology of Dixie Meadows, and that collection of this data would be "begin . . . upon the signing of the Record of Decision" for the Project. Ex. BB (draft ARMMP) at 37. The draft ARMMP did not commit BLM or Ormat to collecting and analyzing this data before Project construction, before the beginning of Project operations, or by a date certain.

BLM provided a brief public comment period following the release of the RDEA. Ex. D (Donnelly Decl.) ¶ 34. This was the final public comment opportunity for the Project before the Decision Record was signed and the Project was approved.

The Tribe and the Center again submitted detailed comments to BLM discussing the many omissions from the RDEA and ARMMP. *See generally* Ex. H (Tribe comments); Ex. P (Center comments). The Tribe's comments also described in detail the Tribe's historical use of the hot springs, and their spiritual, religious, and cultural importance to Tribal members. Ex. H (Tribe comments) at 2-7. The Tribe explained that any development or disturbance near the hot springs would destroy their sacred character, irreparably injure tribal interests, and unlawfully interfere with the Tribal members' religious expression. *Id.*

Several government agencies submitted critical comments on the RDEA and draft ARMMP, including FWS, NDOW, the U.S. Geological Survey ("USGS"), and the Navy. *See generally* Ex. R (FWS comments); Ex. S (NDOW comments); Ex. U (working group meeting notes); Ex. T (Navy comments). The agencies noted the lack of baseline data supporting the RDEA and draft ARMMP, the high degree of uncertainty regarding the Project's impacts to the hot springs and the Dixie Valley toad, and the inadequacy of the ARMMP.

## V.    The National Historic Preservation Act "Section 106" Memorandum of Agreement ("MOA")

Concurrent with the NEPA process, BLM developed a proposed memorandum of agreement ("MOA") between BLM, Ormat, the Navy, the Advisory Council on Historic Preservation, and the State Historic Preservation Office pursuant to the National Historic Preservation Act, 54 U.S.C. § 306108 (commonly known as "Section 106").

The MOA appropriately recognizes the hot springs as a sacred site to the Tribe, and BLM invited the Tribe to sign the MOA based on the documented religious and spiritual significance of the site to the Tribe. Ex I (MOA). However, the MOA relies almost entirely on the ARMMP to mitigate impacts to the sacred site, and if harm occurs to the springs it leaves any response to BLM's discretion. *See id.* The Tribe negotiated in good faith and sought to include meaningful requirements to ensure an adequate response to impacts, but BLM rejected the Tribe's proposals. Ex. C (Mori Decl.) ¶ 6. The various agencies signed the MOA but the Tribe declined, explaining that the MOA improperly relied on the assumption that all impacts could be mitigated, failed to include discrete actions to mitigate impacts, and wholly failed to account for the noise, light, and visual impacts of construction and powerplant operations. Ex. J (Tribe letter re: MOA).

## VI.    Defendants' Approval of the Project

On October 26, 2021, BLM officials informed Tribal leaders that the Project would not be approved pending FWS's ESA listing determination for the Dixie Valley toad, and further evaluation of the Project's impacts. Ex. C (Mori Decl.) ¶ 4. In an abrupt reversal—and without soliciting additional public comment or resolving the issues identified by NDOW, FWS, the Navy, the Tribe and the Center—BLM approved project on November 23, 2021. *Id.* ¶ 5; *see also* Ex. U (Decision Record).

The Final EA that accompanied BLM's approval is substantially the same as the RDEA. It briefly acknowledges that the Tribe bears a disproportionate burden of the impacts created by the Project. Ex. Y (Final EA) at 3-125 to 3-127, 3-136, but improperly determines that these impacts will be appropriately mitigated through the ARMMP and MOA. *Id.* at 3-126. There is no acknowledgement of—or proposed mitigation for—the harm that will occur to Tribal values when

the Dixie Meadows sacred site is de-vegetated, bulldozed, and industrialized during Project construction. Despite the Tribe's repeated stated concerns that construction and existence of 32 acres of 35-foot-tall power plants (which include 75-foot microwave towers), as well as extensive piping and infrastructure, would destroy the traditional cultural landscape and sacred site, BLM provided no visual depiction of the proposal or meaningful evaluation of aesthetic impacts.

The Final EA's position that all potential impacts will be mitigated, moreover, is inconsistent with the uncertainty and delay that characterize the ARMMP. The final ARMMP provides BLM and Ormat with broad discretion as to when and how mitigation is undertaken, and generally requires action only if damaging impacts are observed for three consecutive weeks. Ex. Z (final ARMMP) at 34, Table 17 (p. 77). The Final ARMMP also omits adaptive management thresholds for the Dixie Valley toad, stating that these will be determined at some unspecified later date. *Id*. at 23-33. Consequently, the Project may be constructed and begin operating without any relevant adaptive management triggers in place to protect the toad.

BLM's Decision Record and FONSI rely on the final ARMMP, and the representations made therein, to conclude that the Project will not have significant environmental impacts. Ex. W (Decision Record) at 18. The FONSI acknowledges that the Project will have an "adverse impact" on a Tribal sacred site, but claims that the MOA will resolve these impacts. Ex. X (FONSI) at 5. BLM's Decision is effective immediately. *See* Ex. W (Decision Record); *see also* 36 C.F.R. § 3200.5(b) (stating that "[a]ll BLM decisions or approvals under this part are immediately effective"). Plaintiffs have been informed by Ormat's counsel that construction will begin on January 6, 2022. Ex. A (Lake Decl.) ¶ 7-8.

**VII. Post-Approval Construction Activities and Plaintiffs' Attempts to Avoid the Need for Preliminary Relief**

Shortly after filing the Complaint Plaintiffs began conferring with Defendants and Ormat in an attempt to avoid the need for preliminary relief. Ex. A (Lake Decl.) ¶ 3-6. On December 17, 2021, Defendants informed Plaintiffs that BLM would authorize construction as early as December 21. *Id.* ¶ 4. On December 20, 2021 counsel for the Tribe informed Defendants that it would not be possible for the Tribe to retain and train Tribal monitors—whose presence is required during all

ground-disturbing construction activities under the terms of the MOA—on so short a timeline. *Id.* ¶ 7. Plaintiffs proposed that construction be temporarily stayed while the merits of the action were decided on an expedited basis, thus conserving judicial resources and minimizing delay while still protecting Plaintiffs' interests and allowing the Tribe to provide qualified monitors. *Id*. Plaintiffs alternatively proposed that construction be stayed for a matter of weeks pending the court's decision on a motion for preliminary injunction. *Id.*

Ormat refused both of these offers, and stated that that it would begin bulldozing the landscape on January 6 to meet certain unspecified contractual obligations concerning power production. *Id.* Counsel for Ormat stated that these construction activities would include: vegetation removal, ground leveling, grading, construction of a water diversion ditch from an unspecified source, potential construction of an access road, ten acres of surface disturbance, and the eventual construction of a powerplant. *Id.* ¶ 8.

Consequently, Plaintiffs seek preliminary relief to protect their interests from harm that will immediately occur from these highly impactful construction activities, as well as harm that will occur during the pendency of this case if Ormat is allowed to construct and operate the Project.

## ARGUMENT

### I.    Applicable Legal Standards

The standards for a temporary restraining order and a preliminary injunction are essentially the same. *See, e.g., Nken v. Holder*, 556 U.S. 418, 434 (2009); *Wash. v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017). A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits, (2) irreparable harm in the absence of preliminary relief, (3) that the balance of equities favors relief, and (4) that an injunction is in the public interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011), quoting *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Under the Ninth Circuit's sliding-scale approach, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction" if the irreparable injury and public interest elements are satisfied. *All. for the Wild Rockies*, 632 F.3d at 1135 (internal quotation marks omitted). When a plaintiff has

met this standard, a court may issue an injunction to preserve the environmental status quo pending a final decision on the merits. *W. Watersheds Proj. v. Zinke*, 336 F. Supp. 3d 1204, 1218-19 (D. Idaho 2018).

## II.    Plaintiffs Will Suffer Irreparable Harm Without an Injunction

### A.   Irreparable Harm From Project Construction

This court should issue a temporary restraining order and injunction because Plaintiffs will suffer irreparable injury to their interests in the undisturbed natural environment if construction of the Project commences. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987); *see also Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1124 (9th Cir. 2005) (affirming finding of irreparable harm because, "once the desert is disturbed, it can never be restored"). In deciding whether irreparable harm will occur without an injunction, courts focus on the irreparable nature of the harm, not its magnitude. *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999); *see also Bair v. California Dep't of Transp.*, No. C 10-04360 WHA, 2011 WL 2650896, at *3 (N.D. Cal. July 6, 2011) (injury to root systems of 108 trees, including 37 trees at risk of great harm or death, demonstrated a likelihood of irreparable harm). Where a proposed action will harm a plaintiff group's members' ability to "view, experience, and utilize" an area in its undisturbed state, they suffer irreparable harm. *See All. for the Wild Rockies*, 632 F.3d at 1135 (irreparable injury from logging that would harm plaintiffs' ability to enjoy area in its undisturbed state).

That is precisely what will happen here absent a temporary restraining order and preliminary injunction. Members of the Tribe, including enrolled Tribal member and Tribal Historic Preservation Officer Rochanne Downs, derive enjoyment and health, spiritual, and religious benefits from their activities in and around Dixie Meadows. Ex. B (Downs Decl.) ¶¶ 20-31. Use of the Dixie Meadows hot springs and the surrounding landscape in its current, undisturbed state connects Ms. Downs and Tribal members to their history, culture, and way of life. *Id.* The Tribe refer to themselves as "*Toi-Ticutta*," or "Cattail-eaters," because they have always based

11

their way of life on marshes and springs, including those found in Dixie Meadows. *Id.* ¶ 3. The Tribe's traditional knowledge and oral histories, as well as genetic testing of the "Spirit Cave" human remains, establish that the Tribe's ancestors have lived in Dixie Valley and the surrounding region for at least 10,000 years. *Id.* ¶ 7.

In the Tribe's belief system, the Earth is an animate and living being, with physical features, plants, and animals connected in a "vital balance." *Id.* ¶ 12. According to the Tribe's worldview, the Creator made Dixie Meadows, its ecosystem, and its landscape perfectly, in part to nurture and sustain the Tribe and its members. *Id.* ¶¶ 14, 25-26. An integral part of the Tribe's cultural and spiritual practice is to feel connection to the Earth and the Creator by experiencing the undisturbed natural world. *Id.* ¶ 14-15.

Dixie Meadows, or *Paumu*, is the Tribe's most sacred hot spring. *Id.* ¶ 20. The sacred power of the site derives from the relatively undisturbed state of the surrounding landscape, and the unobstructed views that it offers of Fox Peak, the Tribe's origin site. *Id.* ¶¶ 25-27. Traditional Tribal uses of Dixie Meadows also require an unhindered view of the night sky, through which Tribal members reflect on the vastness of creation and the blessing of being present at the sacred springs. *Id.* ¶¶ 16, 28.

Construction of the Project would irreparably harm the Tribe and Tribal members by changing this irreplaceable and sacred natural setting into an industrial site directly adjacent to the Dixie Meadows wetlands and within the sacred landscape. *Id.* ¶¶ 23-30; Ex. Y (Final EA) at 2-1 to 2-25. Absent an injunction, Ormat will clear this sacred land of vegetation, cut roads through it, and operate major construction machinery upon it for 10 hours each business day. Ex. A (Lake Decl.) ¶¶ 7-8. This will quickly expand to operation of drilling rigs 24 hours a day, 7 days a week, making it impossible for Tribal members to conduct the traditional cultural, spiritual, and religious practices described above. Ex. B (Downs Decl.) ¶¶ 32-45. Construction will also generate noise impacts, for which there is no proposed mitigation. *See id*. ¶ 40.

All of this will impose a significant burden on Tribal members' traditional practices of quiet reflection, prayer, healing, and ceremony. *Id.* ¶¶ 32-45. As Ms. Downs explains, it would

"deeply and irreparably damage" Tribal members "experience of the natural and supernatural world at Dixie Meadows" to pray and reflect next to a major construction site. *Id.* ¶ 41. It would also cause Tribal members "tremendous grief" to see the land within one of their most sacred sites bulldozed and disturbed. *Id.* ¶ 41.

Should the Project be constructed and begin operating, it would also damage the springs, causing further irreparable harm to the Tribe. *Id.* ¶¶ 46-54. If the Project changes the hot springs' water or causes the springs to dry up, as occurred in Jersey Valley, it would be a devastating and irreversible loss. *Id.* ¶¶ 49-55.

The Center's members, including Patrick Donnelly, use and enjoy Dixie Meadows for a variety of purposes, including hiking, photographing scenery and wildlife, viewing wildlife and signs of wildlife, and engaging in other vocational, scientific, spiritual, and recreational activities. Ex. D (Donnelly Decl.) ¶¶ 10-16 25-28. Mr. Donnelly derives particular enjoyment and inspiration from endemic desert species like the Dixie Valley toad, and utilizes these rare and irreplaceable species and ecosystems for exploration, spiritual contemplation, and photography. *Id.* ¶ 16. Mr. Donnelly also values the natural, quiet, and serene character of the Dixie Meadows area that would be immediately and irreparably damaged by Project construction. *Id.* ¶¶ 25-28, 54.

Mr. Donnelly's enjoyment of the Dixie Valley toad and the Dixie Meadows ecosystem would be irreparably harmed if Project construction is allowed to go forward. Id. ¶ 54. Construction, beginning with the 10 acres of clearing, road building, and ditch-digging that will begin on January 6, will permanently alter the natural character of the site, degrade and destroy much of the toad's terrestrial habitat, and could also crush or bury toads using upland burrows or moving through terrestrial habitat in the construction area. *See* Ex. Y (Final EA) at 3-91; Ex. A (Lake Decl.) ¶¶ 6-7.

Mr. Donnelly will also be irreparably harmed by the rapid transformation of the unique and pristine environment at Dixie Meadows into a highly altered and disturbed industrial construction site. Ex. D (Donnelly Decl.) ¶¶ 54-57. He would no longer be able to utilize the area for exploration, photography, and quiet contemplation, as he currently does. *Id*. Bare ground, weeds,

13

roads, fences, noise, dust, heavy equipment, and light pollution would replace the tranquil natural environment that Mr. Donnelly currently values and regularly utilizes. *Id.* ¶ 54.

Mr. Donnelly will be further injured if the Project comes online because, due to Defendants' failure to adequately understand or mitigate the Project's environmental impacts, there is a substantial likelihood that the Project will alter or even eliminate the natural springflow at Dixie Meadows, similar to what has already happened in Jersey Valley. *Id.* ¶¶ 56-57.

These irreparable impacts to the natural environment at Dixie Meadows, and the consequent irreparable harm to Plaintiffs' interests, will be imminent and will almost certainly occur absent a temporary restraining order or preliminary injunction because Ormat intends to begin construction—including stripping vegetation, building a road, levelling a powerplant site, and subsequently pouring concrete—starting on the morning of January 6. Ex. A (Lake Decl.) ¶¶ 7-8.

### B. Irreparable Harm From Bureaucratic Momentum

In the NEPA context, irreparable environmental harm occurs "when governmental decisionmakers make up their minds without having before them an analysis . . . of the likely effects of their decision upon the environment." *Sierra Club v. Marsh*, 872 F.2d 497, 500-01 (1st Cir. 1989) (Breyer, J.); *see also High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 642 (9th Cir. 2004) ("[I]rreparable injury flows from the failure to evaluate the environmental impact of a major federal action."). Approving major federal action without a proper NEPA analysis causes irreparable environmental harm by setting in motion a bureaucratic steamroller that is difficult to stop. *See Marsh*, 872 F.2d at 500-01.

Courts have long held that faulty environmental review justifies a finding of irreparable harm. *See W. Watersheds Project v. Zinke*, 336 F. Supp. 3d 1204, 1241, 1243 (D. Idaho 2018) (holding that "incomplete observance of environmental laws and procedure . . . aided by agency inertia, combine to create irreparable harm," and collecting analogous cases). In *Massachusetts v. Watt*, 716 F.2d 946 (1st Cir. 1983), then-Judge Breyer held that BLM's issuance of mineral leases without NEPA compliance created a risk of irreversible bureaucratic momentum, warranting a

preliminary injunction to preserve the status quo. "Once large bureaucracies are committed to a course of action," he observed "it is difficult to change that course—even if new, or more thorough, NEPA statements are prepared.'" *Id.* at 952-53. The Ninth Circuit has adopted this reasoning. *See N. Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1157 (9th Cir. 1988) ("Bureaucratic rationalization and bureaucratic momentum are real dangers, to be anticipated and avoided"); *West v. Sec'y of Dep't of Transp.*, 206 F.3d 920, 930 n.14 (9th Cir. 2000) (citing *Marsh*, 872 F.2d 497, approvingly).

Here, too, the passage of time will generate irreversible momentum toward Defendants' chosen course of action, making it more difficult for them to later choose a different path. Once a power plant site is graded, roads built, ditches dug, and concrete poured, the more time and resources that are invested in the Project while this case proceeds, the greater the likelihood that future compliance with NEPA and other laws will prove to be merely an empty gesture. An injunction is therefore necessary to ensure Plaintiffs can obtain meaningful relief in this case.

**III.    Plaintiffs are Likely to Prevail on the Merits**

**A.  Defendants' Approval of the Project Violates NEPA**

Defendants' approval of the Project violates NEPA because Defendants have not taken the necessary "hard look" at the Project's direct, indirect, and cumulative impacts. *Nat'l Parks & Conservation Ass'n v. BLM*, 606 F.3d 1058, 1072 (9th Cir. 2010). Defendants also failed to prepare an EIS, despite substantial uncertainty and controversy surrounding the Project's likely impacts to sensitive resources such as wetlands, Tribal sacred sites, and special-status species. *See* 40 C.F.R. §1502.22 (2019). Defendants' violations stem in large part from their overreliance on vague and uncertain mitigation measures, and their failure to collect adequate baseline data.

Where an agency relies on mitigation measures to avoid preparing an EIS, NEPA requires "analytical data to support the proposed mitigation measures." *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1151 (9th Cir. 1998), *overruled on other grounds*, *Lands Council v. McNair*, 494 F.3d 771 (9th Cir. 2007). The proposed mitigation plan must be carefully considered, based on scientific studies, and designed to protect against significant environmental harm. *Greenpeace*

*Action v. Franklin*, 14 F.3d 1324, 1332-33 (9th Cir. 1992). An agency's analysis should focus on the effectiveness of any proposed mitigation measures. *Western Watersheds Project v. Salazar*, 993 F. Supp. 2d 1126, 1139 (C.D. Cal. 2012), *aff'd*, 601 Fed. Appx. 586 (9th Cir. 2015).

In *National Parks & Conservation Ass'n v. Babbitt*, for example, the Ninth Circuit found that an agency violated NEPA where it failed to study the anticipated effects of a proposed mitigation plan or provide criteria needed for taking corrective actions. 241 F.3d 722, 735-36. Similarly, in *Western Land Exchange Project v. BLM*, this Court found a NEPA violation where an EA contained no assurance that any of the proposed mitigation measures would actually be employed, deferred definition of the measures until some unspecified point in the future, and failed to analyze the potential effectiveness of the proposed mitigation measures. 315 F. Supp. 2d 1068, 1091-92 (D. Nev. 2004).

Courts have applied these principles where, as here, an agency seeks to avoid the EIS requirement through a so-called "adaptive management" scheme in which triggers, thresholds, and responses are not sufficiently defined or analyzed prior to the final decision. This "'build-first, study-later' approach to resource management . . . is not what NEPA contemplates." *Mountaineers v. United States Forest Service*, 445 F. Supp. 2d 1235, 1250 (W.D. Wash. 2006); *see also Natural Resources Defense Council v. U.S. Army Corps of Engineers*, 457 F. Supp. 2d 198, 234 (S.D.N.Y. 2006) (finding NEPA violation where the agency relied on ill-defined "adaptive management" protocols to conclude that impacts would be adequately mitigated).

Here, the Final EA and ARMMP show that Defendants have taken a "build-first, study-later" approach to the Project. The ARMMP acknowledges that specific benchmarks and thresholds associated with objectives for Dixie Valley toad populations have not been identified. Ex. Z (ARMMP) at 33. This lack of specific information makes it impossible for decisionmakers and the public to evaluate the effectiveness of any proposed mitigation measures, and undercuts BLM's conclusory assertions throughout the EA that all impacts can be mitigated. Even where the Final EA and ARMMP sufficiently define proposed mitigation measures, they fail to analyze their effectiveness. For example, there is no analysis or data in the Final EA or ARMMP supporting the

selected thresholds for surface water flow, water temperature, or water quality. *See id.* at 32-34. Nor does BLM analyze the effectiveness of specific response actions. BLM simply asserts, without explanation or supporting data, that implementation of the ARMMP would be effective. *See, e.g.*, Ex. Y (Final EA) at 3-30, 3-92. These assertions fail to consider, or even acknowledge, detailed analysis from subject-matter experts pointing out the substantial omissions and inadequacies in the ARMMP. *See, e.g.*, Ex. Q (Myers Tech. Memo on RDEA); Ex. F (Dyer Tech. Memo); Ex. R (FWS comments); Ex. S (NDOW comments); Ex. T (Navy comments). These assertions also assume that any impact to the springs may be reversed, and wholly fail to grapple with the fact that a closely analogous project nearby caused permanent damage to the associated springs.

NEPA also requires an agency to set an appropriate environmental baseline. *See Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988). Without establishing baseline conditions "there is simply no way to determine what effect [an action] will have on the environment and, consequently, no way to comply with NEPA." *Id.*

Here, BLM and Ormat failed to adequately gather baseline data or set an environmental baseline. The ARMMP states that baseline conditions are "currently unknown" for surface water flow, "hydraulic head" (groundwater pressure), water temperature, water chemistry, Dixie Valley toad abundance, Dixie Valley toad distribution, vegetation cover, and aquatic habitat extent. Ex. Z (final ARMMP) at Table 17 (pp. 77-80). The Final EA further admits that baseline data collection for the Dixie Valley toad is "[o]ngoing." Ex. Y (Final EA) at 3-92. This inverts NEPA's mandate that baseline data be collected and analyzed before Project approval. Defendants' failure to collect this essential data means that "there is simply no way to determine what effect" the Project "will have on the environment and, consequently, no way to comply with NEPA." *Half Moon Bay*, 857 F.2d at 510.

Finally, Defendants improperly rely on the ARMMP and MOA to mitigate impacts to the Tribe's unique interest in preserving Tribal members' ability to experience the hot springs and surrounding natural environment as a treasured sacred site. For instance, the EA briefly addresses environmental justice impacts and acknowledges that the Tribe bears a disproportionate burden of

17

project development, but concludes that these impacts are mitigated by implementation of the ARMMP and that "no short-term construction related effects are anticipated."  Ex. Y (Final EA) 3-127 to 3-128. Defendants' analysis wholly ignores the Tribe's repeated explanation that construction of a major industrial power plant covering 126 acres of pristine high desert on and around a treasured sacred site will significantly impact the Tribe's unique, longstanding use of the area.  Defendants completely failed to conduct any meaningful analysis of visual and aesthetic impacts to the Tribe—there are no depictions of what the constructed project will look like, or how it will impair the viewshed and the Tribe's use of the hot springs as a sacred site. "An essential component of a reasonably complete mitigation discussion is an assessment of whether the proposed mitigation measures can be effective."  *S. Fork Band Council Of W. Shoshone Of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009). Defendants' analysis violates NEPA because it contains virtually no assessment of how the ARRMP or other mitigation measures can effectively mitigate impacts to the Tribe's use of Dixie Meadows hot springs for cultural and spiritual practices. Because Defendants have relied on vague, uncertain, and inapplicable mitigation, and failed to collect necessary baseline data, the Tribe and the Center are likely to prevail on their claim that Defendants violated NEPA.

**B.  Defendants' Approval of the Project Burdens the Tribe's Religious Expression and Violates RFRA.**

Congress enacted RFRA "in order to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014). Under RFRA, the federal "Government shall not substantially burden a person's exercise of religion" unless it satisfies strict scrutiny. 42 U.S.C. § 2000bb-1(a)-(b).

"Destruction of religious property" can constitute a "RFRA violation[]." *Tanzin v. Tanvir*, 141 S. Ct. 486, 492 (2020). Courts have applied this principle to the use of Native sacred sites on government-controlled land. In *Comanche Nation v. United States*, the Army planned to build a warehouse on federal land near Medicine Bluffs, a sacred site. No. CIV-08-849-D, 2008 WL 4426621, at *17 (W.D. Okla. Sept. 23, 2008). But the warehouse would have occupied "the precise location" where Native Americans stood for worship near the Bluffs—making their traditional

religious practices impossible. *Id.* at \*7, \*17. The court held that this physical interference with plaintiffs' religious exercise "amply demonstrate[d]" a "substantial burden." *Id.*

Construction of the Project would constitute a substantial burden on the Tribe's religious exercise because it would similarly make observance of the Tribe's traditional religious practices impossible. Ex B (Downs Decl.) ¶ 32-45. The site's sacred power for the Tribe derives from its natural and undisturbed state. *Id.* ¶ 25-26. As depicted in the Project map, the Project would place wells and powerplants on and in direct proximity to the sacred site, permanently impair the view of the Tribe's origin site, Fox Peak, and inhibit views of the night sky with light pollution. *See* Ex. B (Downs Decl.) ¶ 27-28, 32-45. The disturbance, light, and noise inherent in powerplant construction and operations would prevent the Tribe from carrying out its traditional religious practices, which involve quiet reflection, prayer, and connection with the natural world. *Id.* ¶ 32-54. Alteration of the Dixie Meadows hot springs from Project operations would destroy the sacred character of the site. *Id.* ¶ 49.

Defendants will likely be unable to satisfy strict scrutiny under RFRA, which the U.S. Supreme Court has called "the most demanding test known to constitutional law." *Boerne v. Flores*, 521 U.S. 507, 534 (1997). Given the flexibility inherent in Defendants' "multiple use" mandate under federal law, *see* 43 U.S.C. § 1732(a), Defendants will be unable to show that they there is a compelling governmental interest in authorizing geothermal energy development at this particular site. Further, the Ninth Circuit has held that "revenue generation is not a compelling state interest sufficient to justify" extinguishing religious land use. *International Church of Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1071 (9th Cir. 2011) (citing *Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*, 218 F. Supp. 2d 1203, 1228 (C.D. Cal. 2002)). Because construction of the Project will make Tribal religious observance at Dixie Meadows impossible, and because Defendants cannot satisfy strict scrutiny, Plaintiffs are likely to prevail on their claim that Defendants' violated RFRA.

### C. Defendants' Approval of the Project is Arbitrary and Capricious Under the APA Because it Ignores Applicable Policies Regarding Indigenous Sacred Sites

The APA requires court to "hold unlawful and set aside agency action, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The court must determine whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made. *Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671 675 (9th Cir. 2016).

Here, Defendants failed to adequately consider "relevant factors,"—namely, federal policies regarding the protection of indigenous sacred sites—and failed to articulate a rational connection between these policies and the decision made. These include the American Indian Religious Freedom Act, 42 U.S.C. § 1996, Executive Order 13007, the November 15, 2021 Joint Secretarial Order 3403, and a November 9, 2021 memorandum of understanding ("MOU") concerning the protection of indigenous sacred sites. Collectively, these four policy statements articulate a recently emphasized, strong governmental interest in protecting indigenous sacred sites and involving Tribes and Tribal perspectives in federal-agency decisionmaking. Although the Tribe communicated early and often that development of the Project as proposed by BLM and Ormat was incompatible with continuing their traditional spiritual practices and way of life, *see* Ex. E (Draft EA Comments); Ex. G (Oct. 11, 2017 letter); Ex. H (RDEA comments), Defendants failed to acknowledge critical aspects of the Tribe's input. Specifically, Defendants did not account for the certain, significant impacts of project construction to the Tribe's ability to continue to carry out spiritual practices, and did not account for the risk that the project will cause irreversible damage to the water in the springs. *See generally* Ex. B (Downs Decl.); Ex. J (Tribe letter re: MOA). Defendants also appear to have not considered the recent Joint Secretarial Order 3404 or the November 9, 2021 MOU, which are both binding on Defendants. Defendants therefore failed to "consider[] the relevant factors and articulated a rational connection between the facts found and the choices made." *Alaska Oil & Gas Ass'n*, 840 F.3d at 675.

**IV.     The Balance of Hardships Favors an Injunction**

20

To determine whether injunctive relief is appropriate, courts apply a "traditional balance of the harms analysis." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 737 (9th Cir. 2001). In the face of irreparable harm to the environment, courts will withhold or limit injunctive relief only in "unusual circumstances." *Nat'l Parks*, 241 F.3d at 738 n.18 (citation omitted); *see also League of Wilderness Defs./Blue Mts. Biodiversity Project v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014) (holding that if irreparable environmental harm is sufficiently likely, "the balance of harms will usually favor the issuance of an injunction to protect the environment.") (quoting *Amoco*, 480 U.S. at 545).

Here, environmental injury is imminent, while Defendants' hardship from an injunction consists only of delay. *See Alliance for the Wild Rockies v. Marten*, 200 F. Supp. 3d 1110, 1112 (D. Mont. 2016) (holding that the balance of equities tips in favor of an appellant when the agency faces only delay) (citing *League of Wilderness Defenders v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014)); *see also Kootenai Tribe v. Veneman*, 313 F.3d 1094, 1125 (9th Cir. 2002) ("restrictions on human intervention are not usually irreparable in the sense required for injunctive relief" because they can be removed if later proved to be more harmful than helpful). Ormat may allege economic harm from the slight delay of its anticipated construction schedule, but NEPA contemplates some delay while the correct process is undertaken, and "loss of anticipated revenues . . . does not outweigh potential irreparable damage to the environment." *Nat'l Parks*, 241 F.3d at 738. Moreover, where harm to a project developer is speculative because the developer "may suffer financial harm, but if an injunction does not issue, unlawful disruption to [fragile habitat] is likely irreparable," the balance of hardships tips in favor of the environmental plaintiff. *Save Our Sonoran*, 408 F.3d at 1125 (emphasis added) (internal quotations omitted).

## V.   The Public Interest Favors Granting an Injunction

The public interest favors injunctive relief. The Ninth Circuit recognizes "the public interest in careful consideration of environmental impacts before major federal projects go forward, and . . . [has] held that suspending such projects until that consideration occurs 'comports with the public interest.'" *All. for the Wild Rockies*, 632 F.3d at 1138 (citation omitted). Congress

has recognized through the enactment of NEPA that there is a strong public interest in requiring agencies to fully consider the environmental consequences of their decisions. There is also an undeniable "public interest in preserving nature and avoiding irreparable environmental injury," *Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (en banc), and "in careful consideration of environmental impacts before major federal projects go forward," *Alliance for the Wild Rockies*, 632 F.3d at 1138. The public, moreover, has an overarching interest in its government abiding by the laws and regulations governing it. *See, e.g., East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018); *Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1167 (9th Cir. 2011).

**VI.    No Bond Should be Required**

Plaintiffs are a non-profit environmental group and a sovereign Indian Tribe seeking to advance the public interest in this litigation. Therefore, the Court should waive the bond requirement, or impose a nominal bond of $100 under the public interest exception to Fed. R. Civ. P. 65(c). *See Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999).

**CONCLUSION**

For the reasons stated above, the Tribe and the Center respectfully request that this Court issue relief as requested in the Motion for Temporary Restraining Order and/or Preliminary Injunction.

Dated December  22, 2021                     Respectfully submitted,

                                             */s/ Scott Lake*
                                             Scott Lake
                                             Center for Biological Diversity
                                             P.O. Box 6205
                                             Reno, NV 89513
                                             (802) 299-7495
                                             slake@biologicaldiversity.org

                                             *Attorney for Plaintiff Center for Biological Diversity*

*/s/ Gordon H. DePaoli*

Gordon H. DePaoli
Woodburn & Wedge
6100 Neil Road
Reno, NV, 89511
Phone: (775) 688-3010
Email: gdepaoli@woodburnandwedge.com

*/s/ Wyatt Golding*

Wyatt Golding
WA Bar No. 44412
(will comply with LR IA 11-2 within 1 day)
Ziontz Chestnut
1230 Fourth Ave, Suite 1230
Seattle, WA 98070

*Attorneys for Plaintiff Fallon Paiute-Shoshone Tribe*

| TABLE OF EXHIBITS | |
|---|---|
| **Exhibit** | **Description** |
| A | Declaration of Scott Lake |
| B | Declaration of Rochanne Downs |
| C | Declaration of Yvonne Mori |
| D | Declaration of Patrick Donnelly |
| E | June 30, 2017 Comment Letter from Fallon Paiute-Shoshone Tribe to BLM |
| F | June 30, 2017 Technical Memorandum by Dyer Engineering Consultants, Inc. re: Draft EA |
| G | October 11, 2017 Letter from Fallon-Paiute Shoshone Tribe to Ken Collum, BLM |
| H | February 12, 2021 Comment Letter from Fallon-Paiute Shoshone Tribe to BLM |
| I | Memorandum of Agreement ("MOA") among The Bureau Of Land Management, The Department Of The Navy, The Advisory Council On Historic Preservation and The Nevada State Historic Preservation Officer |
| J | September 15, 2021 Letter from Fallon-Paiute Shoshone Tribe to BLM re: MOA |
| K | Transcript of February 10, 2021 Interview with Ashley George, Fallon Paiute-Shoshone Tribal Elder |
| L | June 30, 2017 Comment Letter from the Center for Biological Diversity to BLM |
| M | Petition to List the Dixie Valley Toad as Threatened or Endangered Under the Endangered Species Act |
| N | Endangered and Threatened Wildlife and Plants; 90 day Findings for Three Species (including the Dixie Valley Toad), 83 Fed. Reg. 30091 (June 27, 2018) |
| O | U.S. Fish and Wildlife Service, 90-Day Petition Review Form for Dixie Valley Toad |
| P | February 12, 2021 Comment Letter from the Center for Biological Diversity to BLM |
| Q | February 10, 2021 Technical Memorandum by Tom Myers, Ph.D. |
| R | August 6, 2020 Comments of U.S. Fish and Wildlife Service on BLM ARMMP |
| S | Comments of Nevada Department of Wildlife on BLM ARMMP |
| T | Comments U.S. Navy (NAS Fallon) on BLM ARMMP |
| U | Record of August 24, 2020 Working Group Meeting |
| V | September 22, 2021 email from Kim Tisdale, Nevada Department of Wildlife, to Chris Crookshanks, Nevada Department of Wildlife re: Dixie Meadows Geothermal Utilization Project |
| W | November 23, 2021 BLM Decision Record Approving the Dixie Meadows Geothermal Utilization Project |
| X | November 23, 2021 BLM Finding of No Significant Impact for the Dixie Meadows Geothermal Utilization Project |
| Y | August 2021 Final Environmental Assessment for the Dixie Meadows Geothermal Utilization Project |
| Z | November 22, 2021 Aquatic Resources Monitoring and Mitigation Plan ("ARMMP") for the Dixie Meadows Geothermal Utilization Project |
| AA | January 2021 Revised Draft EA ("RDEA") for the Dixie Meadows Geothermal Utilization Project |
| BB | "Final Draft" Aquatic Resources Monitoring and Mitigation Plan ("ARMMP") for the Dixie Meadows Geothermal Utilization Project |

24

| CC | Michael L. Sorey, *Geothermal Development and Changes in Surficial Features: Examples from the Western United States*, Proceedings, World Geothermal Congress (May 28-June 10, 2000) |