UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| FALLON PAIUTE-SHOSHONE TRIBE and the CENTER FOR BIOLOGICAL DIVERSITY,<br><br>        Plaintiffs,<br><br>    vs.<br><br>U.S. DEPARTMENT OF THE INTERIOR, *et al.*,<br><br>        Defendants,<br><br>and<br><br>ORMAT NEVADA INC.,<br><br>        Defendant-Intervenor | 3:21-cv-00512-RCJ-WGC<br><br>**ORDER** |

Plaintiffs moved the Court for a temporary restraining order and a preliminary injunction to bar construction of an approved geothermal facility. (ECF Nos. 13 & 14). At the hearing on Plaintiffs' motion, the Court granted in part and denied in part. The Court issued an order temporarily restraining and preliminarily enjoining Defendants and Ormat Nevada Inc. ("Ormat") from conducting the work described in the Decision Record for the Dixie Valley Geothermal Utilization Project ("Project") for 90 days, including implementation of the Aquatic Resources Monitoring

1  and Mitigation Plan ("ARMMP"). (ECF No. 31.) By this order, the Court denies Plaintiffs' motion

2  for a preliminary injunction beyond 90 days.

3  **FACTUAL BACKGROUND**

4      The Bureau of Land Management ("BLM") approved Ormat's application to construct the

5  Project in November 2021, finding that the Project would result in no significant impact on the

6  environment and thereby avoiding the need for an Environmental Impact Statement ("EIS"). (ECF

7  No. 13-23, Decision Record ("DR") at 4-21.) The Project, which consists of geothermal production

8  and injection wells, a power plant facility, and an electrical transmission line, is to be constructed

9  in Dixie Valley, about 43 miles northeast of Fallon, Nevada. (ECF No. 13-25, Final Environmental

10 Assessment ("EA") at 1-1.) Defendants contend the binary technology for the plant does not con-

11 sume any groundwater or geothermal resource fluid, and subsurface aquifer pressures are main-

12 tained. (EA at 2-16; ECF No. 24-1, Second Declaration of Paul Thomsen ¶ 4). Construction would

13 take place in an area of existing development, including a pre-existing power line, roads, mineral

14 materials site, and numerous geothermal wells. (*Id.* at 3-113; ECF No. 6-1, Declaration of Paul

15 Thomsen ¶ 10.) The specific configuration of the Project has been changed several times during

16 the six-year environmental review process to accommodate Plaintiffs' concerns regarding impacts

17 to nearby springs in Dixie Valley, including moving the location of one of the power plants and

18 the transmission line specifically to address viewshed concerns. (ECF No. 13-15 at 3-114, 3-126.)

19     The Dixie Meadows Hot Springs are used by members of Plaintiff Fallon Paiute-Shoshone

20 Tribe (the "Tribe") for ceremonial and religious purposes. (*Id.* at 3-119.) In consultation with the

21 Tribe, BLM designated the Dixie Meadows Hot Spring as eligible for listing on the National Reg-

22 ister of Historic Places. (*Id.* at 3-118 to 3-119.) BLM asserted at hearing that the location of the

23 power plant is not within the designated sacred site. Transcript of Jan. 4, 2022 Hearing, at 42:13-

24 16, 44:5-11 (hereinafter, "Tr."). The Tribe disputes this and claims that the sacred site extends to

uplands surrounding the springs. (Tr. 76:6-8.) In addition, the Dixie Valley toad, a species that is not listed as endangered or threatened but whose listing determination is currently pending, is found within wetlands fed from artesian springs on the western edge of the Dixie Valley playa. (ECF No. 13-25 at 3-77.)[1] Plaintiffs allege that both the Tribe's religious practice and the Dixie Valley toad would be adversely affected if the operation of the power plant reduces water quantity, quality, or temperature at the springs in Dixie Valley.

      BLM conducted an Environmental Assessment to analyze whether the Project would have a significant effect on the environment, and specifically on the hot springs. BLM relied on a conceptual hydrogeological model (ECF No. 24-3) supported by a 46-day flow test that replicated the production volume and flow conditions analogous to operating the Phase I proposed 12 MW power plant to determine that the deep geothermal reservoir is **not directly** connected to the springs and that the springs will not be impacted by geothermal production. (*Id.* at 3-35 (test indicated "there were no apparent influences of pumping and injection activities observed at [the springs]"); *see also* EA, App. M (ECF No. 24-4).) BLM also assembled a technical working group comprised of BLM hydrologists and biologists, along with representatives of the U.S. Fish and Wildlife Service ("USFWS"), Nevada Department of Wildlife ("NDOW"), the Navy, and U.S. Geological Survey, and in collaboration with Ormat, to develop the ARMMP for post-approval monitoring that would supplement the pre-approval baseline monitoring and analysis conducted by Ormat. (*Id.* at 1-16; ECF No. 13-26, ARMMP at 2.) The ARMMP is intended to serve as a backstop in the event that uncertainties in the natural system result in unanticipated impacts to the springs. (*See* ECF No. 13-26 at 4; *see also* ECF No. 13-23 at 5.) The ARMMP requires Ormat to continue and enhance its

---

[1] In 2017, Plaintiff Center for Biological Diversity petitioned the U.S. Fish and Wildlife Service ("USFWS") to list the toad as threatened or endangered. (ECF No. 13-25 at 3-77.) Though the USFWS found that the petition presented sufficient information indicating that listing may be warranted, 83 Fed. Reg. 30,091, 30,091-93 (June 27, 2018), a final decision has yet to be made. (ECF No. 13-25 at 3-77.)

baseline monitoring, sets "early warning" thresholds (such as water levels, temperature, and chemical composition), and, if those thresholds are reached, requires Ormat to implement mitigation measures, including but not limited to, modifying or ceasing pumping and injection activities. (*See* ECF No. 13-26 at 27–36.)[2]

In 2017, Ormat entered into a PPA that allows Ormat to sell power from projects coming online before the end of 2022 at a fixed price of $75 per megawatt hour ("MWh"). (ECF No. 6-1 ¶ 17.) This rate is approximately $15 per MWh above current market rates. (*Id.* ¶¶ 17-18.) If the Project does not begin delivering 12 MW of power by the end of December 2022, Ormat stands to lose up to $30 million in revenue over 20 years. (ECF No. 24-1 ¶ 14.) Ormat provided a construction schedule for the Project beginning on January 6 and completing work in December 2022. (*Id.* ¶ 4, Attachment 2.) Upon questioning at hearing, counsel for Ormat stated that Ormat would not be able to complete construction within six months. (Tr. at 68:13-15.)

## LEGAL STANDARD

An injunction is "an extraordinary remedy" awarded only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff bears the burden to "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. This test lays "out four conjunctive tests, not a four-factor balancing test, using the word 'likely' to modify the success-on-the-merits

---

[2] BLM also engaged in consultation with the State Historic Preservation Officer regarding the visual and auditory effects from the presence of the power plants, as well as the potential effects to the springs and ethnobotanical plant communities in Dixie Meadows. (ECF No. 13-25 at 3-120.) The consultation process resulted in development of a Memorandum of Agreement ("MOA") with numerous agencies requiring Ormat to prepare and implement a historic properties treatment plan to minimize and mitigate adverse Project impacts. (ECF No. 13-9, MOA at 3). The Tribe decided not to sign the MOA. (ECF No. 13-3, Declaration of Yvonne Mori ¶ 6). Regardless, the Project is subject to its terms.

test in exactly the same way as the irreparable-harm test." *Guzy v. Guzy*, No. 3:19-CV-00129-RCJ-CBC, 2019 U.S. Dist. LEXIS 51874, at *8 (D. Nev. Mar. 26, 2019). "If success on the merits is merely possible, but not at least reasonably probable, no set of circumstances with respect to the other prongs will justify preliminary relief." *SEC v. Banc de Binary, Ltd.*, 964 F. Supp. 2d 1229, 1233 (D. Nev. 2013).

## ANALYSIS

Applying this test, the Court finds that a preliminary injunction beyond 90 days is not appropriate because the Court cannot find that Plaintiffs are likely to succeed on the merits and, after 90 days, the balance of the harms tips sharply to Ormat.

**I.   Plaintiffs Have Not Demonstrated that They Are Likely to Succeed on the Merits.**

Plaintiffs allege that BLM did not comply with the National Environmental Policy Act ("NEPA") and did not adequately consider tribal concerns under the American Indian Religious Freedom Act ("AIRFA"), Religious Freedom Restoration Act ("RFRA"), and associated federal policies. Given the facts presented at hearing and in the parties' briefing, the Court cannot find that Plaintiffs are likely to succeed on the merits of these claims at this early stage in the litigation.

  **A.   The Court cannot determine at this stage whether Plaintiffs failed to establish that the NEPA Claims Are Likely to Succeed.**

NEPA requires that agencies prepare an Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); 40 C.F.R. § 1502.3.[3] Not every major Federal action requires an EIS. If an agency

---

[3] The NEPA regulations were revised, effective September 14, 2020, but because BLM published the May 2017 Draft EA prior to that date, BLM has elected for the pre-2020 regulations to apply. ECF No. 13-25 at 4-1. Citations in this Order are to the regulations in place prior to September 14, 2020.

prepares an Environmental Assessment ("EA"), and concludes that project impacts will be insignificant, it may issue a Finding of No Significant Impact. *See* 40 C.F.R. §§ 1501.3, 1501.4(c)-(e), 1508.9. "In reviewing an agency's finding that a project has no significant effects, courts must determine whether the agency has met NEPA's hard look requirement, 'based [its decision] on a consideration of the relevant factors, and provided a convincing statement of reasons to explain why a project's impacts are insignificant.'" *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 869 (9th Cir. 2020) (citation omitted).

An agency's NEPA compliance is reviewed under the Administrative Procedure Act ("APA"). *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). Courts may set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Although this review is "searching and careful," the "standard is narrow, and [the Court] cannot substitute [its] own judgment for that of the [agency]." *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 858 (9th Cir. 2004) (citation omitted).

Plaintiffs allege multiple defects in BLM's NEPA analysis. First, Plaintiffs allege that BLM failed to adequately gather baseline data or set an environmental baseline to support the EA. (ECF Nos. 13 & 14 at 17.) NEPA generally requires an EA to "succinctly describe the environment of the area(s) to be affected," 40 C.F.R. § 1502.15, but "[a]n agency need not conduct measurements of actual baseline conditions in every situation—it may estimate baseline conditions using data from a similar area, computer modeling, or some other reasonable method." *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1101 (9th Cir. 2016).

Here, Plaintiffs have not demonstrated that the baseline data was insufficient to support BLM's environmental review. The EA includes detailed baseline analysis of the water resources in the Project area. (*See, e.g.*, ECF No. 13-25 at 3-15 to 3-19; ECF No. 13-26 at 10; ECF No. 24-

3, ARMMP, App. D, Hydrogeologic Conceptual Model at D12 to D14.) Likewise, a variety of baseline data was collected to better understand species distribution and populations in the area. (ECF No. 13-25 at § 3.8.1.) For the Dixie Valley toad, BLM relied on life cycle studies from 2013 and 2017, as well as more recent survey data from the U.S. Geological Survey that indicates habitat preference and typical range within 45 feet of aquatic environments. (*Id*. at 3-77 to 3-79; ECF No. 13-26 at 22-24.) Sufficient information regarding species preferences, encounters, and habitat was available to inform BLM's development of the ARMMP and assessment of effects. *See Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1017 (9th Cir. 2006) (rather than counting individual animals, an agency may in appropriate cases use habitat as a proxy); *see also Great Basin Res. Watch*, 844 F.3d at 1101. In the face of BLM's application of its technical expertise to draw reasonable inferences from the available scientific information, Plaintiffs have failed to demonstrate that BLM lacked sufficient baseline data to support the environmental assessment.

Second, Plaintiffs argue that BLM did not justify its Finding of No Significant Impact because the ARMMP's mitigation measures are too vague and uncertain and BLM did not demonstrate the effectiveness of the ARMMP to ensure "all impacts can be mitigated." (ECF Nos. 13 & 14 at 16-18.) While the Court questioned the adequacy of the ARMMP at the hearing, Plaintiffs have not demonstrated that it was arbitrary and capricious for BLM to rely on the ARMMP.

As an initial matter, BLM is not required to mitigate impacts to "zero" to justify a finding of no significant impact. *Wetlands Action Network v. U.S. Army Corps of Eng'rs,* 222 F.3d 1105, 1121 (9th Cir. 2000) ("If significant measures are taken to 'mitigate the project's effects, they need not completely compensate for adverse environmental impacts.'" (citation omitted)), *overruled on other grounds in Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011) (en banc). Likewise, a complete mitigation plan detailing "the precise nature of the mitigation measures" is not mandated; rather, the proposed mitigation must be "developed to a reasonable degree." *Id*. In

evaluating the sufficiency of mitigation measures, the Court must consider whether the mitigation measures "constitute an adequate buffer against the negative impacts that may result from the authorized activity." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 734 (9th Cir. 2001). The agency is entitled to deference in making these types of determinations based on technical data. *Protect Our Cmtys. Found. v. Jewell*, 825 F.3d 571, 578 (9th Cir. 2016).

Here, BLM concluded that based on the hydrogeological model and flow test, geothermal development was not likely to affect the springs. (ECF No. 13-25 at 3-35; ECF No. 13-26 at 5; ECF No. 24-4, EA, App. M at M-1 to M-3). Nevertheless, to address potential uncertainties regarding impacts to the springs, BLM and Ormat developed the ARMMP in conjunction with the technical working group as a backstop in the event that unanticipated impacts occur. The ARMMP is an adaptive management plan that requires water, aquatic habitat, and species monitoring; sets hard triggers for taking action before geothermal development adversely affects the springs;[4] and demands mitigation ranging from providing replacement water to shutting down the Project to halt or reverse observed effects. (ECF No. 13-26 at 12-24, 27-35.) This approach has been confirmed by the Ninth Circuit in similar cases. *See Okanogan Highlands All. v. Williams*, 236 F.3d 468, 473–77 (9th Cir. 2000); *Wetlands Action Network,* 222 F.3d at 1121. Thus, the Court cannot find that Plaintiffs have demonstrated that they are likely to succeed on the merits of this claim.

Finally, Plaintiffs allege that BLM did not meaningfully consider the impacts of constructing the Project in an area visible from the springs, a sacred site for the Tribe. (ECF Nos. 13 & 14 at 18.) In consultation with the Tribe, BLM delineated and recorded the Dixie Meadows Hot Springs site as a property eligible for inclusion on the National Register of Historic Places. (ECF No. 13-25 at 3-118 to 3-119.) BLM determined that the spring is a "sacred locality that is important

---

[4] For instance, a change of 10% in the surface water flow outside the natural range of baseline conditions for 90% of tier-1 monitoring sites triggers review, and if repeated, requires mitigation. ECF No. 13-26 at 32.

to maintaining Western Shoshone and Northern Paiute traditional cultural beliefs and practices" as a place where tribal traditional ceremonies, practices, and healing rituals occur. *Id.* BLM further found that the hydrological conditions and enthnobiotic resources at the spring are contributing factors to the site's eligibility. *Id.* The record indicates that the area identified by the Tribe as sacred in the consultation process did not include the uplands where the Project will be built. The Tribe previously stated that the Project would be built "directly adjacent to [the] sacred site." (ECF No. 24-6, EA, App. G at G-17.) BLM is entitled to rely on the statements of the Tribe in consultation. Further, the record demonstrates that BLM considered and took substantial steps to minimize the visual impacts of the project. (*See* ECF No. 13-25 at 4-9, 3-114 to 3-115.) Thus, Plaintiffs have not demonstrated likelihood of success on their claim that BLM did not consider the visual impacts of the Project.

> B. *Plaintiffs Have Not Established that Their APA Claims Regarding Consultation Are Likely to Succeed.*

The Court cannot find that Plaintiffs are likely to prevail on the merits of their APA claims based on BLM's sacred site policies because they attempt to elevate non-binding policy statements to the status of law. The APA evaluates agency compliance with "substantive rules," meaning "a 'legislative-type rule,'—as one 'affecting individual rights and obligations.'" *Chrysler Corp. v. Brown*, 441 U.S. 281, 301-02 (1979) (internal citations omitted). Here, neither the AIRFA, Executive Order 13007, or the November 9, 2021 Inter-agency MOU create binding obligations under the law. And the November 15, 2021 Joint Secretarial Order No. 3403 § 3 only "affirm[s]" various principles of consultation with relevant Tribes, but the Tribe does not contend that BLM's consultation process was inadequate. At hearing, Plaintiffs argued that while the policy documents lack the force of law, they identify "important aspect[s]" of the problem that BLM should have considered under *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins.*

1  *Co.*, 463 U.S. 29, 43 (1983). (Tr. 16:1–7.) However, Plaintiffs did not demonstrate how the extensive consultation BLM has undertaken since 2007 regarding the Project (*see* ECF No. 13-25 at 3-123) was insufficient consideration of the topics raised in the policy documents under the *State Farm* standard. Thus, Plaintiffs have not met their burden to show they are likely to succeed on the merits of their APA claim.

        C.      *Plaintiffs Have Not Established that Their RFRA Claims Are Likely to Succeed.*

"To establish a prima facie RFRA claim, a plaintiff must present evidence sufficient to allow a trier of fact rationally to find" that "the activities the plaintiff claims are burdened" are an "exercise of religion" and then that "the government action . . . 'substantially burden[s]' the plaintiff's exercise of religion." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1068 (9th Cir. 2008) (en banc) (quoting 42 U.S.C. § 2000bb-1(a)). To demonstrate a "substantial burden," the Tribe must establish that the challenged government action will cause it to "lose a government benefit or face criminal or civil sanctions for practicing their religion." *Snoqualmie Indian Tribe v. FERC*, 545 F.3d 1207, 1214-15 (9th Cir. 2008).

Plaintiffs' claim that the Project "substantially detract[s]" from or "destroy[s]" the Tribe's ability to exercise its spiritual traditions, (ECF Nos. 13 & 14 at 6, 9), does not demonstrate a "substantial burden" under this Circuit's RFRA precedent. Experiencing a "decrease [in] spiritual fulfillment" because a sacred area has been "spiritually desecrate[d]" does not constitute "coerc[ion] . . . to act contrary to their religion under the threat of civil or criminal sanctions," and is thus not a "substantial burden." *Navajo Nation*, 535 F.3d at 1070; *see Snoqualmie Indian Tribe*, 545 F.3d 1213-15. Even where "the Government's . . . plans . . . will have a devastating effect on the [Tribe's] religious practices" by "*physically destroy[ing]*" the land in question, the Tribe's "RFRA . . . claims must fail" where the Tribes were "not 'coerced by the Government's action into violating their religious beliefs' nor did the 'governmental action penalize religious activity

by denying [the Tribe] an equal share of . . . benefits.'" *Stronghold v. United States*, 519 F. Supp. 3d 591, 607-08 (D. Ariz. 2021) (emphasis added, citation omitted) (pending on appeal). Thus, the facts here do not support the merits of Plaintiffs' claim that the Tribe's right to practice its religion will be "substantially burdened" by the alleged impacts of the Project on Dixie Meadows, and the Court cannot find that Plaintiffs are likely to succeed on their RFRA claim.[5]

## II.  Plaintiffs Show Irreparable Harm in the Absence of an Injunction.

Plaintiffs must demonstrate that they are likely to suffer irreparable harm in the absence of an injunction to be entitled to relief. *Winter*, 555 U.S. at 22. To qualify as irreparable harm, injury must be "both certain and great." *San Diego Bev. & Kup v. United States*, 997 F. Supp. 1343, 1347 (S.D. Cal. 1998) (citation omitted). Moreover, to qualify as "irreparable," the "certain and immediate harm that a Plaintiff alleges must also be truly irreparable in the sense that it is 'beyond remediation.'" *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 39 (D.D.C. 2013) (citation omitted).

Plaintiffs allege possible harms to the springs in Dixie Valley that may result from the operation of the Project. (ECF Nos. 13 & 14 at 13.) Specifically, they allege concerns that the Project could lead to permanent damage of the hot spring, the Dixie Valley toad, and affect the religious practices of the Tribe. Much of the concern arises from the long-term operation of the Project—not the construction that would occur over the pendency of this case, which this Court is committed to resolving on the merits expeditiously.[6]

In terms of construction impacts to the toad, toads are generally found within 45 feet of wetland habitat, (ECF No. 13-25 at 3-77), and the upland area for plant construction is at least 0.25

---

[5] Additional claims based on the Federal Land Policy and Management Act and the U.S. trust obligation to the Tribe were included in the Complaint, but not raised as a basis for Plaintiffs' Motion.

[6] At oral argument, the Parties likewise believed the case could be resolved within six months. (Tr. at 38:5–9, 53:18–21.)

miles (1,320 feet) to 1.5 (7,290 feet) miles from the springs. (ECF No. 6-1 ¶ 12.) Thus, the record indicates that construction will not harm the toad.

Plaintiffs will be immediately irreparably harmed by Ormat's impending construction activities. *See* ECF nos. 13-4 and 14-4 (Donnelly Decl.); ECF nos. 13-2 and 14-2 (Downs Decl.). While the Project's operation is the greater concern for Plaintiffs, the construction would irreparably harm Plaintiffs. The Ninth Circuit has held that a plaintiff group suffers irreparable harm where a proposed action will harm its members' ability to "view, experience, and utilize" an area in its undisturbed state. *All. for the Wild Rockies*, 632 F.3d at 1131 (irreparable injury from logging that would harm plaintiffs' ability to enjoy area in its undisturbed state); *see also Sierra Club v. Trump*, 379 F. Supp. 3d 883, 924-25 (N.D. Cal. 2019) (finding that construction of 30-foot structures and light pollution would irreparably harm plaintiff's members' "aesthetic and recreational interests"); *Sovereign Iñupiat for a Living Arctic v. BLM*, No. 3:20-cv-00290-SLG, 2021 U.S. Dist. LEXIS 22809, at *6-8 (D. Alaska Feb. 6, 2021) (irreparable harm from mining and road construction in the same general area where plaintiffs engaged in traditional Iñupiat hunting and gathering activities). Further, courts focus on the irreparable *nature* of the harm, not its magnitude. *Simula, Inc. v. Autoliv, Inc.,* 175 F.3d 716, 725 (9th Cir. 1999).

Plaintiffs show irreparable harm under this standard. According to Rochanne Downs, the construction activities starting on January 6, including "removing vegetation, bulldozing the land, cutting roads, . . . and operation of major construction machinery" will permanently alter the landscape at Dixie Meadows, "substantially" and "permanently" impairing her "religious and spiritual practices." ECF nos. 13-2 and 14-2 (Downs Decl.) ¶¶ 33, 35, 41-42. Ms. Downs states: "[i]t would . . . cause me tremendous grief to observe the land on a sacred site bulldozed and disturbed, and a wide variety of industrial infrastructure installed." *Id.* ¶ 42. In addition to ground disturbance,

construction will cause ongoing traffic, noise, and light that will interfere with Ms. Downs's enjoyment of the area. *Id.* ¶ 53.

Center member Patrick Donnelly will also be irreparably harmed by "the initial stages" of Project construction. ECF nos. 13-4 and 14-4 (Donnelly Decl.) ¶ 42. As Mr. Donnelly explains:

> [Construction] will involve the operation of several pieces of heavy equipment for ten hours a day, every business day. This will permanently alter and degrade the natural character of the site that make it a special place for me to explore, contemplate the natural desert landscape away from human interference, and take photographs. The serene and tranquil site that I have come to know and love would be replaced by a mess of disturbed bare ground, invasive weeds, new access roads, and fences. I would also have to contend with the noise, dust and light pollution that accompany construction activities. This would substantially impair my ability to view and appreciate Dixie Valley toads and other wildlife. [*Id.*]

The Court therefore finds that Plaintiffs have demonstrated the planned construction will irreparably harm Plaintiffs. Plaintiffs have thus satisfied this element.

**III.   The Balance of Hardships and Public Interest Disfavors the Requested Injunction.**

The Supreme Court has instructed that the Court must weigh the burden on each party if the injunction is granted or denied. *Winter*, 555 U.S. at 23-24. This analysis includes economic impacts on Ormat. *Piatelli Co. v. Chambers*, No. 3:12-cv-225-RCJ-WGC, 2012 U.S. Dist. LEXIS 69490, at *14 (D. Nev. May 11, 2012). And when the government is a party, the analysis of the balance of harms merges with that of the public interest. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

Here, "the relative damages really shift" toward Ormat if the injunction extends beyond 90 days. First, Ormat has invested $68 million in the 10-year process to begin construction of the Dixie Meadows Project. (ECF No. 6-1 ¶ 17.) Ormat has continued to pursue the Project and has the ability to implement the comprehensive and costly ARMMP, in large part because Ormat enjoys a favorable PPA that will allow Ormat to sell power for $75/MWh. (*Id.*) However, the PPA contemplates that Ormat will begin production before the end of 2022 to take advantage of this

above-market price. (*Id.*) This Court finds that a delay of construction beyond 90 days would make it all but certain that Ormat would not be able to complete construction by the end of 2022 and would therefore stand to lose $30 million over 20 years if it cannot include this Project in the PPA. (*See* ECF No. 24-1 ¶ 14.) This would result in reduced royalty returns to the federal government, and local and state taxes applied to the Project and energy production would also not be collected. (ECF No. 6-1 ¶ 18.) Ormat's harm may also be irreparable because Ormat represents that if it loses the favorable pricing in the current PPA, it would be forced to reevaluate the economic viability of the Project given the extensive cost commitments to implement the ARMMP associated with the Project. (*Id.* ¶ 17.)

The Project will also significantly reduce greenhouse gas emissions compared to other baseload energy production facilities, such as power plants using natural gas or coal as a fuel source. The authorized 60 MW geothermal facilities will emit zero tons of carbon dioxide as opposed to 353,859 metric tons of carbon dioxide per year from fossil fuels to generate the same amount of electricity. (*Id.* ¶ 15.) Additionally, unlike wind or solar power, geothermal energy provides a baseload source of power, which contributes to the availability of clean energy 24 hours per day, 7 days per week. (*Id.*)

In sum, the balance of the harms and the public interest tip sharply against extending the preliminary injunction beyond 90 days. Any injunction beyond 90 days makes it effectively impossible for Ormat to begin power production prior to December 31, 2022, meaning Ormat stands to lose $30 million if it cannot include this Project in the PPA and may be forced to abandon the Project entirely, depriving the public of a source of carbon-free baseload electricity.

///

///

///

**CONCLUSION**

IT IS HEREBY ORDERED that Plaintiffs' Motion for Temporary Restraining Order is GRANTED IN PART AND DENIED IN PART.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Preliminary Injunction is GRANTED IN PART AND DENIED IN PART.

IT IS FURTHER ORDERED that the Project shall be preliminarily enjoined 90 days from January 4, 2022.

IT IS SO ORDERED.

Dated January 14, 2022.

_____
ROBERT C. JONES
United States District Judge